Case 14-4058, Cassandra DeNoma v. Hamilton County Court et al. Oral argument not to exceed 15 minutes per side. Mr. Meza Bob for the appellants. Thank you. Good morning, Your Honor. Good morning. May it please the Court, before I begin, I would request five minutes for the appellants. Very well. Thank you, Your Honor. May it please the Court, Ms. DeNoma's appeal is from the decision of the trial court, granting some of the judgment favorably to the defendants, and dismissing Ms. DeNoma's claims of gender discrimination and retaliation. Reduced to its essence, the trial court's decision was based upon what we believe to be the erroneous proposition that jurors could not, as a matter of law, reasonably conclude that either Mr. Walton's bias against women in the probation department and or Judge Kubicki's ire at Ms. DeNoma's participation in protected activities were either motivating factors or approximate cause of the decision to not select Ms. DeNoma for the assistant probation chief position. This is a particularly fact-intensive case, and I certainly cannot go through the entire fact record, and I don't think there's a reason to do so. I think it's adequately laid out in our briefs. Suffice it to say that with respect to discrimination, Mr. Walton harbored a discriminatory animus against female probation officers, and he used his influence as the court administrator to ensure that a male rather than Ms. DeNoma, a female, was hired for the assistant probation officer position. It's important to note that there was no dispute if plaintiff presented a prima facie case of discrimination. The battlefield in this case was over the cat's paw issue and the issue of pretext. Let me address first the approximate cause. To that extent, I want to briefly note some of the facts in the record that support the proposition that this was, as the witnesses said, a boys' club, a boys' network, if you will, in which males were particularly in charge of what took place at the probation department as a direct result of decisions. Was the interview committee and the hiring committee a boys' club as well? I think, in effect, it was a manifestation of a boys' club, and I appreciate the fact that one of the members of the selection committee was a female, but that member of the selection committee, Krista Ventric, was not an employee of the probation department. She perpetuated the decision. And as to the approximate cause issue, I don't see much evidence that the alleged animus based on sex by Walton influenced either the interviewing committee or the hiring committee. And I see speculation and conjecture, but tell me what either direct evidence you have or evidence upon which it can be reasonably inferred that Walton influenced either committee. Yes. I will, Your Honor. First, with respect to evidence of an animus against females in the probation department and against Ms. DeNova. I'm probably there with you on that. I think there's probably none there. I'm really worried about it. I'm concerned about rocking the cause. Well, we have three members of that selection committee who are under the direct supervision of Mr. Walton. This is a small operation. Everybody knew everyone else's business. Mr. Walton was directly responsible for all of those people working there, the positions they held, the favors that he doled out in terms of how the place was run. Are you arguing that because of that direct supervision, that those members of the committee did not exercise independent will or decision-making authority? Oh, absolutely. That their will was overborne by their connection to Mr. Walton? Absolutely. By virtue of Mr. Walton's position, his proximity to them, his influence over them, and his involvement in the selection process itself, and I'll discuss that in a second. There's no question that he, consistent with Sixth Circuit precedent, was in a perfect position to influence attitudes, philosophies, and outlook. When you were in a position to do so, there is no evidence that he did. He had no contact with the interview committee or the hiring committee after the process got going. You're speculating that they may have done something to please him because he's a superior, but I don't think that's enough. You can't allow a jury to speculate again. Well, you can from other facts, but one fact, which is omitted from the trial judge's opinion, is the fact that Walton had specific discussions with Chris Deventry concerning who might likely be the best successor. This is prior to the process. Well, whether it was prior… Didn't she testify in her deposition that she acted independently of his wishes? Well, that is evidence in the record. Is there any evidence to rebut it? Well, the evidence to rebut it is the fact that Mr. Walton had enormous authority and influence over these people, and he discussed with Chris Deventry his views of the people within the department who would likely be applying for that position. So, the cake was already baked, so to speak, before the interview took place. I mean, you're not giving these people a lot of credit. I mean, you're saying that they would act illegally based upon sex-discriminatory motives to please the supervisor. If anything, there's a presumption. I think the presumption is people would apply to all and do the legal thing to do as opposed to the illegal thing to do. Right. Your Honor, with all due respect to these people, I don't believe many of them deserve that level of respect. Why? The testimony is clear. It's unequivocal that cronyism was rampant in this department. Merit didn't account for much. People got appointed because somebody wanted them appointed. Okay. I mean, do you have evidence that these committee members in the past had done the same thing, that there's a pattern of conduct of these interviewing people, the hiring committee, that this is just one of a series of episodes, and therefore, based upon past conduct, we can reasonably infer they did it in the future? Yes. Well, you can infer it from the fact that Casey Denoma herself was appointed to the position because a judge in the Common Pleas Court wanted her in there over the objections of other people. The testimony gave is unequivocal as to the influence and involvement of Common Pleas judges, and in this case, it's Judge Convict. Okay, but that's a Common Pleas judge. We're talking about the administrative law, right? Agreed. Agreed. Okay, well, what do you have of past conduct of Walton? Well, it was Walton who placed the people on that committee, setting aside Venturi as head of substations. It was Walton who decided to remove from Ms. Denoma responsibility for the ICP program and control over the monies involved in that situation. He ran that show. The fact that there was no discussion that we know of involving Ms. Denoma doesn't mean it didn't take place. In fact, the evidence suggests strongly that it did. There's no evidence that it did take place. No, but there is… It's your burden of proof. Of course, and we believe the burden of proof has been established, one, by the evidence of the animus directed towards females. This was the Boys Club according to the testimony. The testimony from Bob Beach that, in his opinion, the most qualified person for that position was Casey Denoma, and he had no ax to grind with Walton. He was under Walton's control as well. He testified unequivocally that with respect to the people participating in that selection process, Ms. Denoma was the most qualified. Objectively, and if we looked at the decision-making process itself, it's flawed. It's rampant with subjective decisions. I want to ask you a question about the retaliation claim. What evidence is there in the record that Judge Kubicki's anger about the Anchor situation was the but-for cause of Denoma's failure to receive the promotion? I want to know if the retaliation is there. Judge, I would take issue with the characterization of but-for cause. It was evidence of whether it was a proximate cause. But the evidence, I think, is this. Judge Kubicki was very concerned about the Walton-Egner relationship, so much so that he discussed it with Venturi, appointed her to look into the matter, and was concerned that the county was at risk, so much so that he wanted to appease Lisa Egner. How do we know that? Because when one of the Common Pleas judges wanted to discipline Ms. Egner, he countermanded her and said, do not discipline her, and told Veitch not to discipline her. That was right after he was informed of Ms. Denoma's involvement with Ms. Egner, advising her of the availability of the EEOC process. So that's clear evidence. At the meeting itself, which was unheard of, he laid into Ms. Denoma and Bob Veitch. They were shaking, they said, by the way in which he talked to them and shook his finger at them. And Veitch talked about how he continued to worry about retaliation up to today from the people in authority by virtue of what happened. So there was motivation for Kubicki to do what he did. There was opportunity for him to do it, and there was a temporal proximity between his knowledge of this information and the actions he took in protecting Lisa Egner, protecting his friend Walton, with whom he discussed the Egner matter personally. That, too, was not mentioned in the district court's opinion. So there is plenty of reason to impute to Judge Kubicki a retaliatory motive to punish and penalize Ms. Denoma for potentially exposing the county to risk. Mr. Benson, you can use your rebuttal time now if you want, but if you want to save it… Well, let me save it and we'll… Okay, any further questions? Unless the court has other questions, then I will. All right, you'll have your full rebuttal. Thank you. Good morning. Good morning. I'll just address a few points, if I could. Are you Ms. Bailey? I am, Kathy Bailey. Thank you. With regard to the sex discrimination claim against Mike Walton, it is certainly accurate that there is no evidence at any time that Mr. Walton was involved in the decision, that he influenced the decision. He was out of town. He didn't know who the committee was. He didn't talk to them. It is unrefuted in the record that the committee said we did not know who he wanted. We didn't care who he wanted. We followed the New Day concept that had been advanced by Judge Kubicki, which has not been discussed. But, sure, we would agree that Ms. Denoma was given every position she had, including her first position with the department, solely because of cronyism. But you said there was no evidence. Isn't there evidence in the record that Mr. Walton discussed his preferences with the candidates with some members of the committee prior to them convening? So it's not accurate to say that there was nothing in the record that he discussed preferences with the committee? There was some testimony in the record that at some point prior, and my understanding was 8 to 10, 12 months prior to when this was actually posted, because this position had been vacant for several years, that prior to that, at least months, well prior, some general discussion with the personnel director about, hey, who do you think might be a good candidate for that position? That was it. That was the extent of that discussion. Never, don't ever give it to Casey Denoma. Never. Casey Denoma better not get this position. She would not be a candidate. That was not the testimony. Her name was never mentioned when that discussion was had. So certainly, during this interview process, there is no evidence of any kind that any of these, this interview panel, had any idea who Mike Walton wanted or did not want. Was there extensive discovery in this case? There was, yes. Okay, so all these questions were asked, I assume by the plaintiff's counsel and everybody, trying to get some evidence. That is correct. Did Walt influence the interview committee, the hiring committee, and they came up with nothing? Well, that is absolutely correct, and in fact, in the complaint, Casey Denoma made an allegation that Mike Walton directly influenced the process, and then abandoned that claim when it was clear through the discovery process that that did not happen, that he had no direct involvement at all, didn't even know who the panel, the interview panel was or who all the applicants were, didn't know who was chosen until after the fact. When that became clear, then the theory became, all right, well, Mike Walton harbors this anti-woman bias. His interview committee knew that he harbored this anti-woman bias, and in order to please them, they made sure that Casey Denoma didn't get it.  That he was anti-woman, that the interview committee believed he was anti-woman, and in fact, all of them testified that they were… Acting on his anti-woman, I guess, I could think of strong support for that. That is correct. Well, you don't dispute, though, that the atmosphere at the probation office was that kind of a two, you know, a voice club. I do dispute that. You dispute that. The fact is, two women, Ms. Clancy and Ms. Jodi George, making these vague, conclusory statements that are not supported in the evidence, and when pressed, each one when pressed to give, give me an example, please, of what you're talking about. Ms. Clancy's only example that she could give was that Mike Walton ran interference for one of the officers in the substation. It was a woman. He ran interference to help a woman. That was the only actual, specific example she could give. Otherwise, general statements. It's a voice club. It's a male network. I thought there was some evidence that the head of the substations was consistent, or almost consistent, in giving to the male as opposed to the female. There were male supervisors in those positions, and it is true that there were no females in those positions. There's no evidence that any females applied for those positions at all. And that's not even where Ms. DeNoma was. She was in intensive supervision. We're talking that's a whole other sort of unit within the information department are these substations. So I think at every point along the way, it breaks down, including the biggest point. When you get to, you can prove all of that. You still have legitimate, non-discriminatory reasons for not choosing Ms. DeNoma. And all three of them, all three of the interview panels testified consistently that it was head and shoulders, Joe Alpers, then Kevin Bonecutter, way down here in a do-not-hire category. It was Ms. DeNoma along with five other males that had applied for the position based on qualifications, past performance, and interview performance. And that's beyond dispute. They all three reached the exact same conclusion. Well, is it surprising, though, that if you're looking at interview performance, if the person conducting the interview has some type of implicit or otherwise bias against a particular category of people or women in this case, isn't it reasonable that that person is going to have a low performance in the evaluation? Well, you would have to prove the first part, that the interview panel had that bias. And there's no evidence of that. But there's testimony in this record, at least, from Ms. Clancy, that Walton marginalized Ms. DeNoma in her position. You're saying that a jury couldn't credit that? Mr. Walton wasn't on the interview panel. The interview panel was three individuals who say they didn't know that Mike Walton had anti-woman bias. But then again, Ms. DeNoma says that, and her argument is that even though he wasn't physically on the interview panel, that his influence on the participants through the influence on these other individuals, I understand that you reject that. But that's the allegation, isn't it? It is the allegation. But that's all it is. There's no evidence of it. The only evidence in the record from all three individuals is that they did not know that he was anti-woman. They did not make their decision based on what Mike Walton wanted. They followed the edict that was laid down by Judge Khabibi, which was, pick the best candidate. Pick the most qualified candidate. Do you have any cases where the panel comes in and says, yes, we were discriminatory? That's not required, is it? No, of course not. And doesn't a guest court theory recognize that and that there are certain inferences the jury can make? So ultimately, there's a fact question that we do rely on the jury to do it in every other case. You have to get to the jury first. You have to get— But I think what John was asking, what I'm asking is, can you get to the jury based on inferences? Especially when you're talking about valid reasons, doesn't the jury have to determine whether they were the reasons? You have to come up with some proof of pretext to reject the legitimate non-discriminatory reasons offered. And those offered were not just the subjective criteria in the interview process. It was very objective that— It's objective that she was weighted down here in the district. But the people doing the weighting are the ones who are alleged to be taken. So that— The only one that's been sued here on a sex discrimination claim is Mike Walton. Mike Walton didn't pick the panel. He did not pick those three individuals to be in his interview panel. The only one that did that was Judge Kavicki, but there is no lawsuit against him for sex discrimination. So you have to prove some affirmative act on behalf of who's been sued for sex discrimination. He wasn't—Mike Walton wasn't involved, didn't pick the committee, had nothing to do with this. Where's the sex discrimination lawsuit then? So he's clever, and everyone knows where his views are. He goes out of town on the day of the interview. There's no way to try and put security there. He was behind it all. Who testified about her being a boy's wife? That was it. How many women were in the department? I don't know how many women were in the department. It certainly was not unusual. Lots of women probation officers, lots of women supervisors. In fact, in the same time period, Mike Walton sat on committees where women were appointed to supervisory positions. He made the recommendation to appoint them to be probation officers, supervisors. He was instrumental in getting them. He was instrumental in getting other top-level, high positions over in his own office appointed—women appointed to those positions. One of the persons on the interview committee was a woman, right? Correct. That's correct. We have concluded it's a reasonable inference. Not all inferences are true. She acted in a sexually discriminatory way. Because I guess the decision was unanimous. It was unanimous. All three—they independently wrote down their choices after the interview. All three had the same conclusion. With regard to the retaliation claim, there's no evidence, despite what Mr. Metzlaff says, that Mr.— I'm sorry, that Judge Kovicki was upset about the behavior that Mr. Noman engaged in that was protected. And, in fact, Mr. Noman admitted in a reply brief as well that he made a distinction between when he met with Bob Beach and herself, between the protected activity, giving Ms. Agner the EEOC information, which he said that's fine, that's what you should be doing, and what he was upset about, which is what Ms. Agner complained about, which was the badgering, the bullying, the harassment. That, he said, is not what is appropriate for a supervisor to do. He made that distinction, and Mr. Noman admitted that there was a distinction. The interview panel, only one of them even knew about Agner's complaint, Ms. Agner's complaint. So he would have to—for there to be liability against Judge Kovicki on his retaliation claim, there would have to be proof that he knew that this interview panel would not pick Ms. DeNoma. And there's no proof of that other than after the fact testimony they gave as to why they didn't, but no proof that he could have predicted that and that that's why he chose— There simply is not enough evidence, as the trial court, I think, correctly determined. There's not a whole lot of evidence to support either of these claims, either against Mr. Waldron or against Judge Kovicki. Your Honor, if you accept the proposition that there's a reasonable, that there is evidence of a voice call, then I believe one has to accept the possibility that the Boys Club permeated that selection committee. The possibility that the Boys Club atmosphere caused it, is that what we're allowing the jury to do? The selection committee itself is a manifestation of the Boys Club. So don't you need more than just a mere possibility? No, you have evidence, and we have evidence. We have evidence of an operation that was— Ultimately, yes. No, it's 51%. I agree. I don't know, but a possibility could be 10%. It could be 5%. A preponderance is 51%. We could try this— And you just say, I have a possibility. Well, that's not sufficient to get past a direct verdict, is it? I agree with that. There is evidence, however, Your Honor, that there was a voice call. The evidence came from at least three sources. Paddock Clancy, Jody George, and Bob Beach. Bob Beach testified unequivocally, number one, that DeNova was the most qualified. Two, how she was marginalized with the ISP program. Same thing that Paddock Clancy testified to, as did DeNova. And the record supports that. As a matter of fact, if you look at the records from the state— I believe it's Exhibit 120, 121— they point out noncompliant areas. It was Waltner who was in charge of that department, in reality, and not that program and not Mr. DeNova. But getting back to the Boys Club, there's evidence of a Boys Club. The selection committee itself is a manifestation of that. Two of the three people on that selection committee were members of the Boys Club. And Ms. Venturi, while she, yes, she had a job in the county, she did not have a job in the probation department. She did not pose a threat or disrupt in any way the Boys Club that existed. She went along with it because it didn't affect her. She wasn't banging her head against the glass ceiling. The other women were, and that was okay with her. She was close to Waltner. She met with Kubicki, discussed the EGNR proposition with her, and Kubicki made clear that he was concerned about the EGNR-Waltner relationship, and he did everything he could to protect EGNR, so she did not sue the county, including not disciplining her and letting these other folks know how angry he was. There is no barrier that I can think of between the decision-making that took place by the selection committee and the influence of Waltner preceding their involvement. The statement by Ms. Valley that Mr. Walton didn't even know who was on the selection committee, with all due respect, is absurd and wrong. The idea that he didn't know who the candidates were is absurd and wrong. As a matter of fact, the evidence is clear that the resumes from the people participating in seeking this job were sent to Mr. Walton, who provided the resumes to Ms. Venturi. Again, this is a small operation. You've got five or six people who controlled how that place ran, and those people were all males. With respect to specificity, with regard to the Boys Club, read again Patty Clancy's testimony about how an elite group of people got benefits from Mr. Walton. All of his friends were put in charge of the substations. The women were removed. That's the testimony. And how did they run it? They were cheating the tax payers. They had their own hours. They could dress the way they wanted to. They got benefits in terms of schedules. They got the cars. They got the mileage. They ran with the probation officers and violated probation and constitutional rights by allowing the police to conduct searches and really monitoring their probationists for the purposes of the police. This was all done by and for these officers, who also worked and got money collecting urine samples so they could get overtime. These were all benefits Walton provided to them. So in response to your honest question about should we presume these people were correct and in compliance with the law at all times, I say no. Not because it's my opinion. It's because it speaks loudly in the record to that effect. And the fact that there was a Boys Club there and that Ms. Dinova was disfavored is not simply conjecture. It's demonstrated by experience of people who lived a life there. And that's what the Sixth Circuit counts. What's she doing now? She retired. The case was brought before that time.